United States District Court
Southern District of Texas
**ENTERED**
September 13, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MANNING ROLLERSON, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:18–CV–00235 |
| | § | |
| PORT FREEPORT and | § | |
| UNITED STATES ARMY CORPS OF | § | |
| ENGINEERS, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Manning Rollerson ("Rollerson") filed this suit against the Brazos River Harbor Navigation District of Brazoria County n/k/a Port Freeport (the "Port") and the United States Army Corps of Engineers (the "Army Corps").

Pending before me is the Port's Motion to Dismiss, which seeks to dismiss the claim brought against the Port under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("Title VI").[1] See Dkt. 20. United States District Judge George C. Hanks, Jr. referred the motion to me for report and recommendation See Dkt. 43. After reviewing the record, analyzing the law, and entertaining oral argument, I **RECOMMEND** the Port's Motion to Dismiss be **GRANTED**.

---

[1] A Motion to Dismiss has also been filed by the Army Corps, but that motion will be addressed in a separate Memorandum and Recommendation.

## BACKGROUND[2]

Rollerson resides in Freeport, Texas and purportedly owns an interest in real property at 537 E. 2nd Street, Freeport, Texas 77542-2401 (the "Property"). The Property is located in the City of Freeport ("Freeport") in an area known as the East End. Rollerson alleges historic prejudice in Freeport pushed racial minorities to settle in the East End. Today, the East End remains a minority-majority neighborhood. The 2010 census numbers identify roughly 87 percent of East End residents as minorities—predominately Hispanic (71 percent) or African American (15 percent).

In recent years, the Port began a phased expansion of its facilities to complement the Freeport Harbor Channel Improvement Project, an ongoing project to deepen the harbor channel and jetty. The Port is the non-federal sponsor for the Freeport Harbor Channel Improvement Project and has been actively involved in the planning process, equally funding the project with the Army Corps. The Port is also undertaking several additional projects in the area surrounding the harbor channel. Based on its website and public presentations, the Port plans to construct a 1300-acre multi-modal facility, two multi-purpose berths with 50-foot draft, and two 120-thousand foot transit sheds at the docks (the "Expansion Projects").

To complete the Expansion Projects, the Port is acquiring properties in the East End. Rollerson alleges that in the last several years the Port has threatened property owners in

---

[2] This section is taken from Plaintiff's Second Amended Complaint ("Second Amended Complaint"). At the 12(b)(6) motion to dismiss stage, I must assume all well-pled facts as true and view those facts in the light most favorable to Rollerson.

the community with condemnation. He claims that the Port makes below-market offers to property owners, including himself, and does not readily provide appraisals to residents. Rollerson alleges that as a result of the Port's property acquisitions and ongoing threat of eminent domain, the value of his Property has diminished.

In the Second Amended Complaint, Rollerson brings only a Title VI claim against the Port.[3] Rollerson alleges that he "is the target of intentional racial discrimination as the Port engages in the illegal land acquisition practices discussed above." Dkt. 36 at 48. The Port has filed a Motion to Dismiss, arguing that Rollerson's Title VI claim should be dismissed because (i) Rollerson lacks standing to assert a Title VI claim; and (ii) Rollerson has not stated a claim upon which relief can be granted. *See* Dkt. 20.

## MOTION TO DISMISS STANDARD

### A.     Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to move for dismissal of a complaint based on lack of subject matter jurisdiction. Because "[f]ederal courts are courts of limited jurisdiction[, t]hey possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). A district court is required to dismiss a case when it lacks the constitutional or statutory power to adjudicate the matter.

---

[3] The Port filed its Motion to Dismiss in response to Plaintiff's First Amended Complaint. The claims against the Port remain the same in the Second Amended Complaint. At oral argument, the parties agreed that the Motion to Dismiss should be considered as if brought against the Second Amended Complaint.

*See Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir. 1998).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir. 1977)). Challenges to subject matter jurisdiction under Rule 12(b)(1) may be "facial" or "factual." Facial attacks contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,* 627 F.3d 547, 553 (5th Cir. 2010). A factual attack is made when "the defendant submits affidavits, testimony, or other evidentiary materials." *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir. 1981). The plaintiff bears the burden of proof in the Rule 12(b)(1) context, but a court should grant the motion "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming,* 281 F.3d at 161 (citing *Home Builders Ass'n of Miss., Inc.,* 143 F.3d at 1010).

**B.     Rule 12(b)(6)**

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This pleading standard does not require "detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). Under Rule 12(b)(6), a party may "move for dismissal for a failure to state a

4

claim upon which relief can be granted." *Lemieux v. Am. Optical Corp.*, 712 F. App'x 409, 412 (5th Cir. 2018) (internal quotation marks omitted). "The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Lowrey v. Tex. A&M Univ. Syst.*, 117 F.3d 242, 247 (5th Cir. 1997) (citation omitted).

Dismissal is appropriate "when a plaintiff fails to allege sufficient facts that, taken as true, state a claim that is plausible on its face." *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 254 (5th Cir. 2011) (citation omitted). "Determining whether the plausibility standard has been met is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Although motions to dismiss under Rule 12(b)(6) are filed in many cases, the Fifth Circuit has repeatedly cautioned that such motions should be "viewed with disfavor and . . . rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks and citation omitted).

**SUBJECT MATTER JURISDICTION UNDER RULE 12(b)(1)**

The Port asks that I dismiss the Second Amended Complaint due to a lack of subject matter jurisdiction, arguing that Rollerson lacks standing to bring his Title VI claim.[4] The Port claims that Rollerson's standing is deficient for several reasons:

> (a) Plaintiff does not own or reside on the Property; (b) Plaintiff has neither received nor accepted any offer to sell any property to the Port or expressed any desire to do so; (c) Plaintiff has no right to pursue any private right of action against the Port under the [Uniform Relocation and Acquisition Policies Act of 1970 ("URA")]; (d) the URA does not apply to the Port because there is no causal relationship between the federal funds the Port receives and the activities about which Plaintiff complains; and (e) Plaintiff has not sustained any injury-in-fact that is concrete and actual or imminent, as opposed to hypothetical.

Dkt. 24 at 9–10.

The issue of standing presents a "threshold jurisdictional question" in any lawsuit filed in federal district court. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). *See also Singh v. RadioShack Corp.*, 882 F.3d 137, 151 (5th Cir. 2018) ("Standing must be decided at the threshold of every federal case—before a determination on the merits.") (citation omitted). The requirement that a party have standing to bring suit flows from Article III of the Constitution, which limits the scope of the federal judicial power to the adjudication of "cases" or "controversies." U.S. CONST. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than the

---

[4] The Port originally asserted that "Rollerson has not established the requisite nexus between the racial discrimination he claims under Title VI and the federal funding the Port receives and that the Port is entitled to Eleventh Amendment immunity." Dkt. 24 at 8 n.3. In its reply brief, the Port stated that it "withdraws its reliance on those two grounds for dismissal." *Id.* At oral argument, the Port confirmed the same. As such, I need not consider these arguments.

constitutional limitations of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks and citation omitted).

To establish standing under Article III, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

I have considered the well-pled facts in the Second Amended Complaint, undisputed facts in the record, and disputed facts in the light most favorable to Rollerson. *See Tsolmon v. United States,* 841 F.3d 378, 382 (5th Cir. 2016). After carefully weighing the evidence, I am satisfied as to my power to hear the case. I, therefore, reject the Port's effort to dismiss the case based on a lack of subject matter jurisdiction.

In my view, Rollerson has presented sufficient evidence to indicate that he has "a direct, substantial[,] and legally protectable interest in the [P]roperty." *League of United Latin Am. Citizens v. Clements*, 884 F.2d 185, 187 (5th Cir. 1989) (internal quotation marks and citation omitted). Rollerson's grandmother unquestionably owned the Property for a long time. She passed away intestate in 1998, and an interest in the Property apparently passed to Rollerson's mother. When Rollerson's mother passed away, she might have left an interest in the Property to Rollerson. Rollerson has paid the taxes on the Property since his grandmother's death more than 20 years ago, lived in the home that was on the Property

for 20+ years, and received a letter from the Port seeking to acquire the Property. Although the affidavit evidence does not conclusively prove that Rollerson acquired an interest in the Property from this mother, I do believe that Rollerson has met his burden at this stage of the proceedings.

With respect to the Port's assertion that Rollerson has neither received nor accepted any offer to sell any property to the Port, the documentary evidence belies such a claim. In a December 2, 2016 letter addressed c/o Rollerson, the Port offered to purchase the Property for $21,454. *See* Dkt. 10-1. Based on this evidence, I find that Rollerson has a legitimate financial interest in this proceeding.

Next, the Port claims that Rollerson has no right to pursue any private right of action against the Port under the URA,[5] adding that the URA does not apply to the Port because there is no causal relationship between the federal funds the Port receives and the activities about which Rollerson complains. The problem with this argument is that Rollerson is not advancing a private cause of action under the URA. His only claim against the Port is brought under Title VI. Accordingly, it is wholly irrelevant to the standing analysis whether Rollerson can—or cannot—allege a claim under the URA.

Lastly, the Port contends that Rollerson has not suffered an injury-in-fact. I do not find this argument convincing. Because Rollerson has an interest in the Property, he will undoubtedly be financially impacted by the ultimate ruling in this case. Moreover, he specifically alleges in the Second Amended Complaint that his interest in the Property has

---

[5] The URA is a federal law intended to ensure fair compensation and assistance for those whose property is acquired for public use under eminent domain.

8

been damaged by the Port's actions. In my mind, that suffices to meet the standing requirement since he has a personal interest in the outcome of the case. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). Rollerson need only *allege* an injury that can be fairly traced to the actions of the Port. He has done so. I find that subject matter jurisdiction exists and now turn to analyze whether Rollerson's Title VI claim passes muster under Rule 12(b)(6).

### FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)

Title VI of the Civil Rights Act prohibits discrimination in federally-funded programs. It provides that "[n]o person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance." 42 U.S.C. § 2000d. "To prevail on a claim for relief under Title VI, a private litigant must prove: (1) that the defendant engaged in *intentional* discrimination based on race, color, or national origin; and (2) that the defendant received federal financial assistance." *Pathria v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 531 F. App'x 454, 455 (5th Cir. 2013) (citations omitted).

To survive a Rule 12(b)(6) motion to dismiss on the Title VI claim, Rollerson must, at a bare minimum, "plead facts in support of intentional discrimination." *Price ex rel. Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (citation omitted). *See also Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) ("Title VI itself directly reaches only instances of intentional discrimination.") (internal quotation marks, brackets, and citation omitted); *Bisong v. Univ. of Hou.*, 493 F. Supp. 2d 896, 904 (S.D. Tex. 2007) ("The

Supreme Court and the Fifth Circuit have held that a private right of action exists under Title VI only for violations involving intentional discrimination.") (citations omitted). In other words, Rollerson must allege facts that "allow [me] reasonably to infer that the alleged discrimination was motivated by his national origin [or race]." *Pathria*, 531 F. App'x at 455 (citation omitted). "A complaint that fails to provide specific allegations of acts that were taken with discriminatory intent does not state a claim for Title VI discrimination." *Vouchides v. Hous. Cmty. Coll. Sys.*, No. H-10-2559, 2011 WL 4592057, at *6 (S.D. Tex. Sept. 30, 2011) (internal quotations marks and citations omitted). Importantly, there is no private right of action under Title VI for disparate impact discrimination. *See Sandoval*, 532 U.S. at 281.

I have carefully reviewed the 52-page Second Amended Complaint in an effort to determine whether Rollerson has sufficiently stated a claim that can survive a Rule 12(b)(6) motion to dismiss. Although the live pleading is lengthy and provides plenty of historical information, it falls far short of the Title VI requirement that a litigant plead facts in support of intentional discrimination. Other than the bald assertion that the Port has engaged in intentional racial discrimination, Rollerson has failed to include factual allegations related to his Title VI claim that, when assumed to be true, "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

There are simply no facts alleged that suggest that the Port's land acquisition activities directed at Rollerson were motivated by purposeful racial discrimination.[6] At

---

[6] Rollerson objects to my consideration of extrinsic evidence submitted by the Port in support of its Rule 12(b)(6) motion to dismiss. Although a party may present extrinsic evidence in support

best, Rollerson has sufficiently alleged through the Second Amended Complaint that (i) Freeport (but not the Port) has a wretched history of discrimination; (ii) the Port is seeking to acquire property in a predominantly Hispanic and African American neighborhood; and (iii) the Port has failed to provide *all* East End residents (no matter what their race) the relocation benefits dictated by the URA. These allegations are insufficient. Importantly, Rollerson cannot point to any facts that remotely suggest that the Port took actions against him with a discriminatory intent based on his race, color, or national origin. Indeed, the Second Amended Complaint does not explicitly reveal Rollerson's race, color, or national origin. While Rollerson spends much time discussing the East End's changing demographics, he never discloses where exactly he fits into that narrative. This alone warrants dismissal of his Title VI claim. *See, e.g., Sharma v. City of Detroit*, 35 F. App'x 400, 401 (6th Cir. 2002) (affirming dismissal of Title VII discrimination claim where "plaintiffs did not identify their race, color, religion, sex, or national origin in the complaint"). *See also Bisong*, 493 F.Supp.2d at 904 ("The court's 'inquiry into intentional race [or national origin] discrimination is essentially the same for individual actions brought under . . . Title VI and Title VII.'" (quoting *Baldwin v. Univ. of Tex. Medical Branch at Galveston*, 945 F. Supp. 1022, 1031 (S.D. Tex. 1996))).

---

of a Rule 12(b)(1) subject matter jurisdiction motion, the general rule when it comes to a Rule 12(b)(6) motion to dismiss for failure to state a claim is that a court "may not go outside the pleadings." *Colle v. Brazos Cnty., Tex.*, 981 F.2d 237, 243 (5th Cir. 1993) (citation omitted). To this end, I have not considered any of the extrinsic evidence provided by the Port in deciding the Rule 12(b)(6) motion to dismiss. I have only considered such extrinsic evidence, as I am expressly permitted to do, in connection with the Rule 12(b)(1) motion to dismiss.

Moreover, Rollerson's failure to set forth "specific allegations of acts that were taken with discriminatory intent" is also lethal to his Title VI claim. *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 627 (N.D. Tex. 2017) (internal quotation marks and citation omitted). *See also Muthukumar v. Univ. of Tex. at Dallas*, 471 F. App'x. 407, 409 (5th Cir. 2012) (affirming dismissal of Title VI claim where the plaintiff failed to allege facts that "could prove discriminatory intent" and raised "factually barren and facially insufficient [allegations] to state a claim of discrimination based on national origin"); *Malik v. Cont'l Airlines Inc.*, 305 Fed. App'x 165, 169 (5th Cir. 2008) (affirming dismissal of Title VI claim under Rule 12(b)(6) because "[t]o state claims for intentional discrimination, [plaintiff]'s complaint must allege more than labels and conclusions" and her "[f]actual allegations must be enough to raise a right to relief above the speculative level," and her "complaint f[ell] well short of these standards") (internal quotation marks and citation omitted).

Rollerson argues that intentional discrimination need not be proved by a single type of evidence, but that the Port's intent to discriminate should be assessed on a cumulative basis. He points to *Village Of Arlington Heights v. Metro Housing Development Corporation*, 429 U.S. 252, 266 (1977) for the proposition that I should consider "'the impact of the official action' including whether 'it bears more heavily on one race than another.'" Dkt. 22 at 20.

In *Arlington Heights*, the Supreme Court considered whether Arlington Heights engaged in racial discrimination when it refused to rezone a 15-acre parcel of land from single-family to multiple-family classification. *See* 429 U.S. at 257. The developer and

several minority individuals sued for injunctive and declaratory relief, alleging Arlington Heights's rezoning denial was racially discriminatory. *See id.* at 258. The Supreme Court acknowledged that an "official action will not be held unconstitutional solely because it results in a racially disproportionate impact. Disproportional impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.* at 264–265 (internal quotation marks and citation omitted). The high court went on to evaluate several different types of evidence in its analysis. In a recent case, the Fifth Circuit laid out the framework set in *Arlington Heights*:

> In *Arlington Heights*, the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and courts must perform a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body. Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed because of that disparate impact. The challengers bear the burden to show that racial discrimination was a substantial or motivating factor behind enactment of the law; if they meet that burden, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.

*Veasey v. Abbott*, 830 F.3d 216, 230–31 (5th Cir. 2016) (internal quotation marks and citations omitted). Although *Arlington Heights* was decided in the context of a Fourteenth Amendment Equal Protection claim, the test also arguably applies to claims of intentional discrimination under Title VI. *See Faith Action for Cmty. Equity v. Hawaii*, No. 13-00450 SOM/RLP, 2015 WL 751134, at *5–6 (D. Haw. Feb. 23, 2015).

"When a plaintiff opts to rely on the *Arlington Heights* factors to demonstrate discriminatory intent through direct or circumstantial evidence, the plaintiff need provide 'very little such evidence . . . to raise a genuine issue of fact . . .; *any indication of discriminatory motive* . . . may suffice to raise a question that can only be resolved by a fact-finder.'" *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996)) (emphasis added). Consequently, Rollerson must sufficiently allege that the Port had a discriminatory motive in its attempt to purchase his Property.

Rollerson makes the following allegations:

124. The fact that only East End properties and property owners are being targeted for acquisition has had, and is having, a discriminatory impact on East End residents.

125. The East End of Freeport has quite a sordid history as an area where the white population could put African Americans, and other minorities, "out of the way," making its very existence ripe for being taken advantage of when the time was right.

126. The Plaintiff has already identified that the Port is substantially departing from the substantive requirements found in the relevant statutes, as discussed in the paragraphs above. Specifically, the Port has failed to have proper appraisals performed, failed to allow the property owners to participate in the appraisals, made wholly inadequate offers for the purchase of property, failed to provide adequate relocation assistance, and threatened condemnation proceedings without then initiating such proceedings when the property owners refused to sell.

127. The "swap housing" program being run by the Port is a deviation from the normal acquisition and housing relocation processes under the Uniform Act, which shows a discriminatory intent against the residents of the East End, including the Plaintiff and similarly situated residents.

128. There is administrative action, or rather inaction, demonstrating the USACE's assent to these illegal practices by the Port. Namely, in order to

>get relocation assistance from the Port, former East End resident Arnold Damain had to request it, rather than it being offered. It is highly likely that other similarly situated East End residents have gone without appropriate relocation assistance and have refrained from requesting such for fear of reprisal.

Dkt. 36 at 49. Based on these allegations, I will discuss the relevant *Arlington Heights* factors.

**Historical Background:** The contemporary historical background does not weigh in favor of intentional discrimination. In the Second Amended Complaint, Rollerson spends a significant amount of time discussing the history of the East End. While "historical background" is certainly one of the *Arlington Heights* factors, the Fifth Circuit also recognized that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *Veasey*, 830 F.3d at 232 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987)). The history of the East End explains why it is a primarily minority-majority neighborhood, but it does not automatically demonstrate discriminatory motive.

The historic injustices that minorities experienced in the East End are, undoubtedly, tragic. In October 1930, Freeport passed an ordinance defining a "negro district" in Freeport, pushing African Americans out of certain neighborhoods and into the East End. Dkt. 36 at 6. There is a long history in Freeport of racism and segregation. Due to this history, many minorities had no choice but to settle in the East End. According to the 2010 census, 86 percent of residents in the East End are minorities—71 percent identify as Hispanic and 15 percent identify as African American. *See id.* at 7. This backdrop is not completely irrelevant. However, Rollerson has not alleged that the 1930 ordinance still

15

applies, nor does he allege that the same officials are making discriminatory decisions today. He also does not set forth any alleged facts that indicate that the Port's decision makers and Freeport's decision makers are the same people. The fact that the East End is a minority-majority neighborhood explains why the Expansion Projects are disproportionally affecting minorities. While Freeport may have a long history of prejudice, Rollerson has not alleged sufficient facts to demonstrate that racial animus is the motivation behind the Port's current actions toward him.

**Sequence of Events Leading up to the Decision:** Rollerson is challenging the Port's efforts to acquire property in the East End. There is no legislative history to examine. Instead, I will examine the sequence of events behind the Port's expansion efforts. As part of the Freeport Harbor Channel Improvement Project, the entrance to the harbor channel and jetty will be deepened from 45 feet to 55 feet. It is logical that the Port would want to build facilities to complement the channel improvement, such as a "1300-acre multi-modal facility, two multi-purpose berths with 50-foot draft, and two 120-thousand foot transit sheds at the docks." Dkt. 36 at 9. From the plans submitted in the pleadings, the East End properties are directly adjacent to the channel improvement project. *See id* at 10–13. Moreover, the diagram depicting the properties the Port has acquired through March 2019 demonstrates that the Port is seeking to acquire all land within a defined area. *See id* at 41. The Port is not attempting to pick and choose which plots of land to acquire based on the race or national origin of the property owner. The Port's expansion is impacting all landowners in the East End, regardless of their race or national origin. The sequence of events does not weigh in favor of intentional discrimination because the Port's Expansion

16

Projects are a logical complement to the channel improvement project. The Port has the right to acquire properties for these types of purposes and Rollerson fails to allege any facts that point to the Port's discriminatory animus.

**Departure from Normal Procedures:** Rollerson argues that "[t]he 'swap housing' program being run by the Port is a deviation from the normal acquisition and housing relocation processes under the [URA], which shows a discriminatory intent against the residents of the East End, including [Rollerson] and similarly situated residents." Dkt. 36 at 49. Even assuming, for the sake of argument, that (i) the URA applies to the Port's acquisition activities; and (ii) the Port has failed to follow the URA's directives, such actions are not indicative of an improper motivation based on race or national origin. These alleged facts merely demonstrate that the Port has failed to follow the proper procedures against all individuals, not necessarily that such conduct is targeted to any identifiable minority group.

**Substantive Departures and Legislative History:** The other *Arlington Heights* factors do not apply to this case. Rollerson has not presented statistics demonstrating a clear pattern of discriminatory impact and there is no relevant legislative or administrative history.

In summary, Rollerson has failed to allege that the Port's actions are motived by discriminatory intent. He has failed to state a viable Title VI claim and this claim must be dismissed. *See Robinson v. Md. Dep't of the Env't*, No. RDB-13-2234, 2014 WL 2038022 (D. Md. May 16, 2014) (dismissing Title VI claims by low-income minority residents in historically-segregated community located in proximity to a former industrial site

undergoing redevelopment based on the failure to state a plausible claim of purposeful racial discrimination, stating that permitting such a claim would expose government defendants "to wide-spread, open-ended . . . liability for any redevelopment project in blighted areas that are in some proximity to neighborhoods with significant populations of racial minorities simply based upon bald allegations of purposeful discrimination").

## CONCLUSION AND RECOMMENDATION

For the reasons stated above, I **RECOMMEND** that the Port's Motion to Dismiss be **GRANTED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this 13th day of September, 2019.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE